Jamal UDDIN, Plaintiff,

v.

CITY OF NEW YORK, NYC Human Resources Administration, Janice Scott, Director, Roy Francis, Supervisor II, Defendants.

No. 03 Civ. 4093(RWS).

United States District Court, S.D. New York.

April 12, 2006.

Michael A. Cardozo, Corporation Counsel of the City of New York, by Diana Goell Voigt, Esq., Shivani Soni, Esq. Of Counsel, New York, NY, for Defendants.

*OPINION*

SWEET, District Judge.

The City of New York (the "City"), the New York City Human Resources Administration ("HRA"), Director Janice Scott ("Scott"), and Supervisor Roy Francis ("Francis") (collectively, the "Defendants"), have moved pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint of plaintiff Jamal Uddin ("Uddin" or the "Plaintiff") alleging that the Defendants retaliated against him in violation of Title VII, 42 U.S.C. § 1983 (" § 1983"), the New York State Executive Law § 296 ("NYHRL"), and the New York City Human Rights Law ("CHRL"). For the reasons set forth below, the motion of the Defendants is granted, and the complaint dismissed.

***Prior Proceedings***

Uddin filed his complaint alleging retaliation in violation of § 1983, the NYHRL, and the CHRL on June 5, 2003. Discovery proceeded.

Uddin's claims of retaliation are based on the following allegations: (1) Defendants prepared false disciplinary charges against Plaintiff, resulting in his non-selection for supervisor positions, and also resulting in the imposition of a fine of three days pay; (2) Defendants denied Plaintiff's requests for necessary resources, such as a larger work station with a working telephone, from March 2002 until his transfer to the Division of Shelter Services on January 11, 2004; (3) Defendants served Plaintiff with baseless disciplinary and

Kousoulas & Associates by Antonia Kousoulas, Esq. Of Counsel, New York, NY, for Plaintiff.

counseling memoranda; (4) Defendants denied Plaintiff promotional opportunities; and (5) Defendants unlawfully removed Plaintiff's name from the civil service list for Supervisor I positions, thereby depriving him of promotional opportunities over a six-month period in 2003.

Defendants moved for summary judgment, pursuant to Fed.R.Civ.P. 56, on March 4, 2005. The motion was marked fully submitted on August 25, 2005.

### The Facts

The facts are set forth in the Defendants' Local Rule 56.1 Statement, Plaintiff's Statement of Contested Material Facts Pursuant to Local Rule 56.1, and Defendants' Response to Plaintiff's Statement of Contested Material Facts. They are not disputed except as indicated.

On or about March 3, 1986, Uddin began his employment as a case worker with the New York City Special Services for Children, which is now known as New York City Administration for Children's Services ("ACS").

On July 23, 1999, Uddin filed a lawsuit against the City and ACS in which he alleged discrimination because of national origin and retaliation. Specifically, Uddin claimed that his former ACS supervisors discriminated against him, retaliated against him when he complained of the discrimination, and created a hostile work environment. *See Uddin v. New York City,* No. 99 Civ. 5843(GEL), 2001 WL 1512588, 2001 U.S. Dist. LEXIS 19373 (S.D.N.Y. Nov. 28, 2001) (*"Uddin I"*).

At about the same time that Uddin filed his lawsuit in *Uddin I,* he testified in his deposition that he, along with approximately 369 former ACS employees, were not selected for the new title of Child Protective Specialist, and that as a result he was transferred to HRA. Thereafter, the court granted Defendants' summary

judgment as to Plaintiff's retaliation claim and ordered a trial on Plaintiff's discrimination claims. The trial in *Uddin I* took place between August 8 and 14, 2001, and at the conclusion, the jury returned a verdict in Plaintiff's favor.

Uddin began employment with HRA's HIV/AIDS Services Administration ("HASA") located at its Brooklyn Greenwood Center on August 2, 1999 as a tenured case manager. He was employed in HASA from August 2, 1999 until January 11, 2004 as a case manager, at which time he was promoted and transferred to another division within HRA.

He was responsible for reviewing financial, housing, and individual needs of the HIV clients serviced by HRA and initially worked under George Smith and Janet Ortiz, both supervisors at HASA's Greenwood location.

On or about September 5, 2000, Uddin requested and was granted a transfer to HRA's Coney Island Center. On September 14, 2000, Uddin requested permission to return to the Greenwood location because his commute to HRA's Coney Island location was difficult. Scott, the Director of HASA at the Greenwood location, had no objection to Plaintiff returning to the Greenwood location and approved his return to HASA's Greenwood location.

Uddin admits that he testified that Scott, the Director of HASA at the Greenwood Center, had no objection to his return to the Greenwood Center. However, Uddin disputes that the decision to approve his request to return to the Greenwood Center was made by Scott and that he directed his request to Scott.

Uddin testified that in or about December 2000, upon his return to the Greenwood location, he reported to Francis, then a Supervisor I, and was supervised by

Francis from December 2000 until July 2002.

Thereafter, Uddin was supervised by Ronald Burns, Janet Ortiz, Glynis Perry, and Bertin Duphrezin, all supervisors at the Greenwood Center location against whom no charges of retaliation are made.

Uddin testified that Scott retaliated against him because she was: (1) rude to him, (2) told Francis to document his work performance, (3) had disciplinary charges brought against him, (4) denied him a desk with a telephone line, and (5) denied him the supervisor of his choice. In his affidavit in opposition Uddin has claimed that his claim of retaliation against Scott is based solely on the facts outlined in paragraph 16 of Plaintiff's 56.1 Statement.

According to Defendants, Uddin testified that Francis retaliated against him by issuing him false memoranda on October 22, 2001 and March 13, 2002. In his affidavit in opposition Uddin has disputed that his testimony limited his claims of retaliation against Francis to the issuance of these two memoranda. Uddin also testified that Francis issued him a meritless disciplinary memorandum on June 15, 2001, alleging that Plaintiff was absent from the office on June 13, 2001; failed to approve his field visit time in 2002; warned Plaintiff on or about October 12, 2001, "you better watch out, they are going to get you;" referred to Plaintiff as "the troublemaker" in May of 2002; stated to Plaintiff soon after disciplinary charges were brought against him that, "It does not matter if you defeat the charges, even if you vindicate yourself in a few years time, a lot can happen in that time. The damage is already done;" and issued Plaintiff unwarranted disciplinary memoranda.

Defendants contend that Uddin testified during his deposition that he did not receive any disciplinary action based on memoranda issued by Francis. Uddin dis-putes that he made such a concession at his deposition. In Plaintiff's deposition testimony that is referenced by Defendants, Plaintiff testified both that he did not grieve Francis' issuance of the false memoranda and that he did not receive any disciplinary action as·a result of a complaint made by a client, Howard P., on July 31, 2001.

Scott. testified that she was aware that Uddin had brought a lawsuit against the City in August 2001 but did not know the nature of the lawsuit or that it was based on allegations of discrimination. In his affidavit in opposition Uddin concedes that Scott so testified, but disputes that Scott was actually unaware of Plaintiff's discrimination action. According to Uddin, Scott was aware of his discrimination claims prior to October, 2001.

Scott further testified that she first saw newspaper clippings concerning Uddin's lawsuit posted in the cafeteria in October or November 2001, after she had requested that disciplinary charges be brought against Plaintiff. In his affidavit in opposition Uddin also recognizes that Scott testified first seeing newspaper clippings concerning Plaintiff's lawsuit posted in the cafeteria in October or November of 2001, but disputes that she testified that she noticed the clippings after she had requested that disciplinary charges be brought against Plaintiff.

Francis testified in his deposition that he was aware of Plaintiff's lawsuit against ACS but did not know that Uddin had claimed any kind of discrimination. In his affidavit in opposition, Uddin disputes that Francis was unaware of Plaintiff's discrimination lawsuit. Francis further testified that he saw a newspaper article, dated September 7, 2001, concerning Plaintiff's "bias" lawsuit in the lunchroom but did not read the article. Uddin admitted that

Francis was not involved in the decision to bring disciplinary charges against him.

During Uddin's employment at HASA, the Greenwood office was renovated and as such HASA was relocated to a different floor at the same location, and all employees were displaced. Uddin testified that upon being displaced, he was assigned to a desk with a working telephone for some time; however, he was reassigned to a different desk in 2002 which did not have a working telephone. According to Uddin, he was assigned to a desk without a telephone from March 2002 until January 11, 2004, when he transferred to the Division of Shelter Services as a Supervisor I.

Scott testified that she first received a complaint from Uddin concerning the lack of an operating phone line on July 30, 2003. Uddin disputes that Scott's testimony is correct. According to him, Scott was first informed of the fact that Plaintiff's work station lacked a working telephone soon after Plaintiff was moved to that work station in or about March 2002.

Defendants dispute Uddin's assertion that as a result of not having his own telephone, he was unable to do his job or that his career at HRA was negatively affected. Uddin states that in view of Uddin's direct interaction with HASA clients, the lack of a working telephone interfered with Uddin's ability to fully perform his duties.

Scott testified that during the renovation, all employees at Greenwood were sharing phone lines and Uddin had the opportunity to move to another desk with an operating telephone. Uddin disputes that other employees were sharing phone lines when he was assigned to a cubicle that lacked a telephone.

According to him, the relocation occurred in February of 2001, and the HRA employees who were relocated shared telephone lines until April of 2001. Uddin was moved to a cubicle with no telephone access in or about March of 2002.

Uddin testified that he was not aware if other employees also complained about the lack of telephones, but asserted in deposition that there were available work stations with telephone access and that Scott decided not to assign Uddin to those work stations.

Uddin also alleges that he was retaliated against with the issuance of unwarranted disciplinary memoranda. Uddin testified that on September 14, 2001 he, as a junior union delegate, Hector Molina, Denise Warren, Rafael Garcia and Stephen Akiano, other union delegates, discussed holding a vigil in memory of those who perished on September 11, 2001. Uddin alleges that it was Molina who initially suggested that they introduce the union delegation at the meeting.

Uddin testified that on that same day all of the union delegates requested permission from Scott to hold a prayer vigil at 3:00 P.M., which would include introducing the new union delegation. Scott permitted them to hold a vigil, but informed the delegates, including Uddin, that she would not permit them to introduce the new union delegation members at this prayer vigil.

Uddin disputes that Scott instructed the union members not to introduce the new union delegation at the prayer vigil. Uddin testified that Scott expressed her discomfort with union members introducing the new union delegation, and that thereafter Molina stated that they would simply identify those present at the meeting.

Scott testified in her deposition that she authorized the union delegates to hold a prayer vigil and that she did not authorize them to hold an emergency staff meeting or to distribute a flyer.

Garcia declared that despite this directive, Uddin alone insisted that he distribute flyers, which set forth the union delegates' "original agenda" which was to introduce the new union delegates at the prayer vigil. According to Uddin, it was not he alone that insisted that he distribute the flyers setting forth the union delegates' "original agenda." He stated that Molina was the one who insisted that flyers be made and distributed, notwithstanding the fact Uddin communicated to Molina that he was not in favor of such a flyer. Uddin also disputes that Garcia testified that the "original agenda" of the meeting was to introduce new union delegates only. Garcia testified that the meeting's "original agenda" was to hold a prayer vigil and to introduce the new union members.

Uddin admitted during his deposition that Garcia and Molina did not feel comfortable with introducing the new union delegates during the prayer vigil, but disputes that Molina was never in favor of the introduction. According to Uddin, after learning of Garcia and Molina's discomfort with the introduction, Uddin revised the flyers, omitting any reference to the union delegate introduction.

During Uddin's deposition, he admitted that he made a flyer for the vigil and gave it to others for distribution. Uddin disputes that it was his idea to make and distribute the flyer and that he testified that it was Molina who "insisted" that Uddin made a flyer on his computer for distribution.

Garcia declared that he refused to distribute the flyer. The flyer stated that Local 371 was holding an emergency staff meeting on September 14, 2001 at 3:00 P.M. and at such meeting the new union delegation would be introduced. Uddin testified that he did not distribute any of the flyers and was not aware of whether the original or a revised flyer was distributed.

Uddin testified that while he was revising the flyer to delete any reference to the introduction of the new union delegation, Scott asked him to come to her office for a meeting, and that he went to Scott's office with the revised flyer with Molina and Garcia. Uddin disputes that Scott made this request in a professional manner and instead contends that Scott shouted at him to come to her office. Uddin further testified that upon going to Scott's office she closed the door and loudly told the delegates, "I run the office. You don't."

Scott testified that when all of the union delegates entered her office, Molina and Garcia informed her that Uddin had created the flyer. Uddin, however, mentioned to her that he had revised the flyer so as to omit mention of the introduction of the new union delegation.

Scott testified that she only authorized Uddin, Molina, and Garcia to hold a prayer vigil and that she "did not agree for someone to put a flyer out saying it was an emergency staff meeting or the introduction of the new delegates" and that she had an issue with the delegates calling the prayer vigil an emergency staff meeting, introducing new union delegates, and issuing a flyer. Uddin disputes that Scott only authorized him, Molina, and Garcia to hold a prayer vigil and also disputes that Scott's testimony in this regard is accurate. According to Uddin, Scott did not order Uddin or the other delegates not to introduce union delegates when they first sought her permission to hold the prayer vigil.

Uddin admitted during his deposition that during this meeting he alone responded to Scott by telling her not to yell at them. Uddin has alleged that Scott then raised her voice to him.

Uddin admits that as he was leaving Scott's office, he said, "This whole thing is stupidity," and that upon being asked by Scott as to what he had just said, he repeated the comment to Scott directly.

Uddin disputes that Molina and Garcia intervened between him and Scott to prevent the argument from escalating. Instead, according to Uddin, he walked out of the room as Scott was screaming at him, "get the fuck out of here!" Scott testified that Uddin did not touch her during the meeting and that neither Molina nor Garcia "physically" intervened.

Uddin also admits that as he walked out of Scott's office, he said "people should go to school or training to learn how to behave."

Uddin stated during his deposition that Scott has raised her voice to other individuals in the office on other occasions and that Scott is generally "downgrading" to other individuals in the office.

On September 17, 2001, Scott sent Uddin a memorandum in which she advised him that he was going to be formally written up for his conduct at the meeting on September 14, 2001. Uddin responded to this memorandum but did not allege the disciplinary charges were the result of retaliatory animus. However, Uddin disputes that he did not believe at that time that Scott's efforts to serve disciplinary charges upon him were retaliatory.

As a result of the events of September 14, 2001, Scott also sent a memorandum to Dawyn Farrelly, Disciplinary Liaison, requesting that disciplinary action be taken against Uddin. Scott testified that she requested that disciplinary action be taken against Uddin because he threatened her, referred to her as "stupid," and told her that she needed an education. According to Uddin, additional statements were made which Defendants deny.

On or about December 13, 2001, Uddin was served with charges in connection with the events of September 14, 2001. An informal conference was held on January 3, 2002 in connection with these charges. Present at this meeting was Dorothy Royal ("Royal"), informal conference holder, Uddin, and Jon Peek ("Peek"), Uddin's union representative. After the informal conference, Royal substantiated the disciplinary charges and recommended that Uddin be fined three days pay.

Uddin asserted his rights under the collective bargaining agreement between the City and the Social Services Employees' Union, Local 371 ("SSEU") and sought to challenge the penalty at a Step II hearing.

On or about May 29, 2002, Uddin's Step II hearing was scheduled, but he failed to appear because he was on annual leave. Uddin informed Peek that he was unable to attend the hearing due to a family emergency and Peek unsuccessfully sought an adjournment of the hearing. The hearing proceeded in Uddin's absence. Peek attended the Step II hearing as Uddin's union representation.

On or about June 3, 2002, Alfred L. Dukes Sr. ("Dukes"), Deputy Director in the Office of Labor Relations at HRA denied Uddin's Step II grievance.

On or about June 20 2002, Uddin received a letter from, Eric Washington ("Washington") Deputy Commissioner of the Office of Labor Relations, that the Step II grievance had been indicating denied.

On June 20, 2002, Uddin's fine of three days pay was implemented.

Uddin testified that he asserted his right to have a Step III conference regarding the charges brought against him, which took place on October 10, 2002. Uddin attended Step III with his union representative Robert Jordan ("Jordan"), Griev-

ance Representative, on October 10, 2002. According to Defendants, Uddin testified that he was satisfied with the union representation that he received during the Step III. Uddin disputes that he was satisfied with the representation that he received at the hearing.

On October 22, 2004, Uddin's Step III grievance was denied.

On October 21, 2004, SSEU, Uddin's union, filed a request to arbitrate the fine assessed against Uddin in connection with the September 2001 charges. The arbitration remains open awaiting an arbitration date and there has been no final decision rendered on Uddin's disciplinary charges.

Uddin has alleged that HRA also retaliated against him by not restoring his name to the civil service list for exam number 0542, the Supervisor I, promotional exam. Uddin conceded that in June 2003 his name was restored to the civil service list, but there is a dispute as to whether Uddin was promoted in December 2003. Uddin attended an interview in December 2003 for the position of Supervisor I at the Division of Shelter Services, and was appointed to that position in January 2004.

In February 2000, Uddin took a civil service promotional exam for the position of Supervisor I, and in March 2001, he received a civil service list number of 176. He testified that he attended the next available civil service hiring pool for Supervisor I positions within HRA on or about December 20, 2002.

Judith Lowenstein ("Lowenstein"), a Civil Service List Management Coordinator with HRA, was in attendance of the civil service pool that day along with Rosalyn Johnson ("Johnson"), Pool Supervisor.

Lowenstein testified in her deposition that she was not aware that Uddin had previously filed a discrimination lawsuit against ACS or that he had filed a retaliation lawsuit against HRA.

Elvia Alexander ("Alexander"), Supervisor II Welfare in the Crisis Intervention Unit of HRA testified that upon notifying personnel that her unit had a vacancy for a Supervisor I position, she was invited to interview candidates at the civil service pools held in December 2002.

During her deposition, when questioned about the procedure to prepare for the interviews she holds during a civil service pool, Alexander testified that she attends the hiring pool, relies on the personnel who administer the pool to obtain instructions on how to proceed with interviews and receives a questionnaire on questions that she is permitted to ask. While Uddin agrees that Alexander received a questionnaire from personnel, Uddin disputes that the questions Alexander could have asked were limited to those contained in the questionnaire. Specifically, Alexander testified that she was given a questionnaire that she "could utilize in terms of general questions [she] could ask for interviews."

Alexander has testified that the interviewers are not informed about any disciplinary matters pending for any of the job candidates that they interview. Uddin disputes that the interviewers were not informed about the disciplinary matters of the candidates. Lowenstein testified that she knew of Uddin's disciplinary charges and that interviewers are informed of disciplinary charges upon completing their respective interviews. Lowenstein also testified that pending disciplinary charges relating to insubordination would be sufficient to warrant non-selection.

According to Uddin, Alexander testified that pending disciplinary charges played no role in her decision not to select Uddin to the position of Supervisor I in the Crisis Intervention Unit. The Defendants have denied this characterization of Alexander's

testimony. When questioned about what role, if any, pending disciplinary charges have on her decision to select a candidate, Alexander admitted that she didn't know as "this [was] the first time this happened."

Uddin has testified that at the December 20, 2002 civil service hiring pool, he completed a form in which he selected to interview with the Crisis Intervention Unit, Food Stamps Unit, and HASA. However, Uddin disputes that he subsequently attended interviews for these positions. HASA did not interview Uddin because the vacancies in that unit were filled before Uddin's name was reached on the civil service list.

Alexander alone was charged with selecting a candidate to fill the vacancy of Supervisor I in the Crisis Intervention Unit of HRA. Alexander testified that Uddin was interviewed on December 20, 2002 and that he was not accepted for the position.

Alexander testified that she makes a decision as to whether to accept a candidate based on the way in which the candidate answered her questions and that she asked Uddin the same types of questions that she asked the other candidates that interviewed for the same vacancy. The Defendants have denied Uddin's statement that Alexander's decision was based solely on the interview answers. Lowenstein testified that after the interview, handwritten notes from the disciplinary unit relating to pending disciplinary charges are also provided to the interviewer.

Alexander testified that she does not know any individuals by the names Mary Richardson, Janice Scott, or Roy Francis.

Uddin testified that he received notice from the Department of Citywide Administrative Services ("DCAS") that he was considered but not selected for three Supervi-sor I positions and therefore that his name was removed from the civil service list. Uddin disputes that he was considered but not selected for three Supervisor I positions at the December 20, 2002 hiring pool. Uddin argues that he was not considered for the HASA Supervisor I vacancy as it purportedly had been filled before Uddin's name had been reached on the list and that therefore the removal of his name from the civil service promotional list pursuant to Rule 4.7.1(c) of the Personnel Rules and Regulations of the City of New York was unlawful.

On or about December 20, 2002, Uddin requested that his name be restored to the civil service list. Lowenstein testified that the civil service list unit reviewed Uddin's December 2001 charges of discipline and determined that these charges did not prevent HRA from requesting that Uddin's name be restored to the civil service list and he was in fact restored to the civil service list. However, Uddin states that his name remained off the civil service promotional list from December 2002 until June 2003. According to him, he was actually restored to the civil service list after the commencement of this pending action in June of 2003. Defendants deny this.

Defendants assert that on March 4, 2003, HRA advised DCAS that it would reconsider Uddin for the next certification for a Supervisor I position. Uddin has denied this characterization. According to Uddin, on March 4, 2003, HRA merely provided DCAS with a list of individuals who were eligible to be reconsidered for the next certification for a Supervisor I position.

On May 12, 2003, Uddin was notified by HRA that his request for restoration to the Supervisor I list was granted. HRA had requested that DCAS restore his name to the civil service list. This correspondence was sent to Uddin after he was

issued a right to sue letter by the United States EEOC in connection with this pending action.

Uddin testified that he attended the next available hiring pool on or about December 23, 2003. While Defendants contend that Uddin has failed to allege that because of his removal from the Supervisor I list he was unable to attend any hiring pool, Uddin states that he was unable to attend three civil service hiring pools for Supervisor I positions while his name was removed from the civil service promotional list between December 2002 and June 2003.

During his deposition, Uddin testified that on December 23, 2003 he chose to be interviewed for the Medical Assistance Program and Division of Shelter Services Systems and that he was selected for promotion by the Division of Shelter Service Systems.

Uddin's promotion to Supervisor I with HRA's Division of Shelter Services was effective on or about January 11, 2004.

According to Uddin, in addition to responding to civil service pool notices, he responded to several job vacancy flyers between August 2002 and November 2003, an allegation the Defendants have denied.

According to Defendants, Uddin responded to only one job vacancy flyer prior to August 2002 for the provisional position of Supervisor I in HRA's Family Independence Aid Unit. Defendants further argue that the response to this flyer indicates that Uddin declined this position. However, Uddin disputes that he declined this position. Uddin contends that he did not receive an offer for the position. According to him, the exhibit to which Defendants refer reflects that Uddin purportedly failed the pre-screening process for the position, which Defendants have denied.

Uddin testified that he did not receive any evaluations during his employment at HRA's HASA Greenwood location.

He also testified that he "cannot complain" about his present position at HRA's Division of Shelter Services.

Uddin filed a charge of retaliation with the United States Equal Employment Opportunity Commission ("EEOC") on June 5, 2002 and was issued a notice of right to sue by the EEOC on March 24, 2003.

Uddin commenced the instant action on June 5, 2003.

### The Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 338 (2d Cir.2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). If, however, " 'as to the issue on which sum-

mary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir.2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996)).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997).

### The Requirements For A Prima Facie Case Of Retaliation

In order to establish a *prima facie* case of retaliation, a plaintiff must prove that: (1) he engaged in protected activity; (2) defendants were aware of the protected activity; (3) he was subjected to an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir.1996); *see also Gordon v. New York City Bd. of Ed.*, 232 F.3d 111, 116 (2d Cir.2000); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768–69 (2d Cir.1998). The Second Circuit has held that a close temporal relationship between the protected activity and an employer's adverse actions can be sufficient to establish causation. *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir.2002) (citing *Cifra v. General Elec. Co.*, 252 F.3d 205, 217 (2d Cir.2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.") (internal quotation marks omitted)). For mere temporal proximity to establish causality, the intervening period must be "very close." *Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

If the plaintiff establishes a *prima facie* case of retaliation, the defendant may articulate a legitimate, non-retaliatory reason for its actions. *Id.* at 768. Finally, if the defendant does articulate such a reason, the plaintiff bears the burden of proving that the proffered reason is merely a pretext for retaliation. *Id.* at 769.

For the purposes of this motion only, the Defendants have conceded that Uddin engaged in protected activity when he filed his lawsuit against ACS in 1999 and continuing through the trial, which concluded on August 14, 2001. *See Uddin I.* At issue are the remaining elements of a *prima facie* case of retaliation, namely the evidence presented with respect to the awareness of Francis and Scott, Supervisor II in HASA of the basis for Uddin's lawsuit; whether he was subject to an adverse em-

ployment action [1]; and whether any alleged adverse actions were taken against him because he engaged in protected activity.

***Defendants Had No Knowledge Of The Nature Of Plaintiff's Protected Activity***

■ In order to prevail on his claim of retaliation, a plaintiff must establish that defendants were aware that he engaged in an activity that is protected under Title VII. *See Reed*, 95 F.3d at 1178. In other words, Uddin must establish not only that his lawsuit was filed under Title VII, but also that Defendants were aware that he filed the lawsuit. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (defining the term protected activity to refer to protest or opposition "to statutorily prohibited discrimination"); *Montanile v. N.B.C.*, 211 F.Supp.2d 481, 488 (S.D.N.Y.2002) (dismissing plaintiff's retaliation claims because alleged retaliator testified that she had no knowledge of plaintiff's internal complaint of discrimination), *aff'd*, 57 Fed.Appx. 27 (2d Cir.2003).

Here, both Scott and Francis testified that although they were aware that Uddin had filed a lawsuit against ACS, neither were aware that Uddin had alleged discrimination based upon his national origin. Francis testified that he was happy when he learned that Uddin had won his lawsuit because he thought that the lawsuit concerned loss of income when he transferred from ACS to HRA.

■ Uddin has alleged that he has satisfied the second element of his retaliation claim because he only is required to show that HRA had knowledge of his 1999 lawsuit against ACS in *Uddin I*. Generally, knowledge can be established by showing that Defendants had "general corporate knowledge" of Uddin's protected activity.

*See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000). Uddin claims that HRA had knowledge of *Uddin I* because ACS was still a part of HRA when he commenced that action.

■ However, in each of the cases that Uddin has cited, the defendant in the retaliation lawsuit was also the alleged discriminator and thus knowledge was established. Here, the undisputed record shows that HRA and ACS became two separate entities in 1996 and Uddin has conceded that he filed *Uddin I* three years after ACS legally separated from HRA. Accordingly, Uddin has failed to establish that any of the Defendants here had "general corporate knowledge" of *Uddin I*.

Uddin has also alleged that Scott and Francis specifically were aware of *Uddin I* because his co-workers and supervisory staff at HASA's Greenwood Center allegedly discussed his victory in *Uddin I* and because Scott received a note in or about August 2001 concerning the trial of *Uddin I*.

■ However, Uddin has not set forth evidence to show that at the time that any of the alleged adverse actions were taken Defendants had any knowledge of the nature of *Uddin I* or that it involved a discrimination claim. Uddin has relied on articles published in two union publications to show that the HRA had knowledge of *Uddin I*, having alleged that his supervisors frequented the lunchroom where the articles were purportedly posted in an effort to show that they had notice of *Uddin I*. *See* Pl. Mem. at 6–7. There is no evidence that supervisory HRA employees read any of these articles until October 2001, after Uddin was informed that he would be charged and issued several counseling memoranda.

1. Defendants also concede for the purposes of this motion only that the alleged failure to promote Uddin constitutes an adverse employment action.

Accordingly, Uddin has not established that the HRA, as an independent entity, or that the individually named defendants, had specific knowledge of Uddin's lawsuit or that the claims therein concerned discrimination. *See Montanile v. N.B.C.*, 211 F.Supp.2d 481, 488 (S.D.N.Y.2002).

### No Adverse Action Has Been Established

 Uddin has alleged that he suffered several different adverse actions as a result of prevailing in his discrimination lawsuit against ACS. An adverse employment action occurs when a plaintiff sustains "a materially adverse change" in the terms and conditions of employment. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (citing *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)). The Second Circuit has noted that "not everything that makes an employee unhappy is an actionable adverse action." *Phillips v. Bowen*, 278 F.3d 103, 117 (2d Cir.2002) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996)). A "materially adverse change" might occur in the context of "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya*, 202 F.3d at 640 (holding that plaintiff's transfer from one special education school to another was not an adverse employment action) (citation omitted).

The alleged adverse actions taken against Uddin in retaliation for engaging in a protected activity include the following: (1) he alleges that he was denied the supervisor of his choice; (2) he alleges that he was denied a desk with a telephone; (3) he alleges that he was issued negative memoranda by his supervisors regarding his availability during work hours and was counseled about client complaints; and (4) he alleges that he was charged with insubordination and misconduct. *See* Complaint ¶¶ 8(4)–8(8).[2]

 First, Uddin has alleged that in 2000, when his request to return to HASA's Greenwood location was granted, he requested that he return to the supervision of Janet Ortiz and that this request was denied. Moreover, he contends that he requested to be supervised by Bertin Duphrezin in May 2002 and that this request was also denied. Instead, Uddin was placed under Francis' supervision from December 2000 until July 2002 and Nadia Rankin's supervision for six weeks beginning in June 2002. While Uddin may not have liked his direct supervisors, that he was not supervised by the supervisors of his choice does not rise to the level of an adverse employment action. *See Lee v. New York State Dep't of Health*, Nos. 98 Civ. 5712(RMB)(HBP), 99 Civ. 4859(RMB)(HBP), 2001 U.S. Dist. LEXIS 11287, at *52 (S.D.N.Y. Mar. 26, 2001) (denial of plaintiff's request for a new supervisor not an adverse employment action). Working for Francis may have been undesirable for Uddin; however, he has failed to establish how such circumstances materially altered his terms or conditions of employment.

---

**2.** Uddin has also alleged that Defendants failed to promote him in retaliation for his prior ACS lawsuit. *See* Complaint ¶¶ 8(8)8(9). Defendants concede for purposes of this motion that the alleged delay in Uddin's promotion to Supervisor I in December 2003 may be an adverse employment action. However, as discussed below, Uddin cannot establish a causal connection between the protected activity and the alleged failure to promote him.

■ Nowhere does Uddin allege that the terms and conditions of his work changed because he was supervised by either Francis or Rankin. A change in supervisor is analogous to a lateral transfer. A "pure lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Pimentel v. City of New York*, No. 00 Civ. 326(SAS), 2002 WL 977535, at *3–4, 2002 U.S. Dist. LEXIS 8454, at *11–12 (S.D.N.Y. May 14, 2002) (quoting *Adeniji v. Admin. for Children Serv., NYC*, 43 F.Supp.2d 407, 426 (S.D.N.Y.1999)); *see also Hawana v. City of New York*, 230 F.Supp.2d 518, 528 (S.D.N.Y.2002) (plaintiff's complaint that he was denied a transfer was not adverse in nature because plaintiff was seeking a transfer "to get away from his supervisor"). Nowhere does Uddin provide evidence that being denied the supervisor of his choice resulted in a change of his job responsibilities, was a set back in his career, or affected possible promotional opportunities. *See Galabya*, 202 F.3d at 641. Accordingly, it is determined that an adverse employment action is not established by the denial of Uddin's preference for a particular supervisor.

■ Similarly, the facts adduced regarding HRA's alleged failure to provide Uddin with his own telephone at Greenwood do not establish that Uddin suffered an adverse employment action. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) (loss of an office and phone "standing alone, has never been held adverse action"). While at HRA's Greenwood Center, Uddin testified that the office was renovated, and, as such, that HASA was relocated to a different floor. He further testified that all employees were displaced and that, although he had a desk with a working telephone for some time, he was reassigned to a different desk at some point in 2002, which did not have a working telephone. Uddin testified that he remained without a working telephone for over a year. However, the evidence also establishes that he first complained about this situation to Scott on July 30, 2003 by memorandum dated June 20, 2003. Therefore, Uddin has not adduced evidence demonstrating that this loss of a telephone changed the terms and conditions of his employment or that similarly situated employees of HRA received a telephone without any disruption.

■ Uddin has also alleged that he suffered an adverse employment action when he was counseled about his lack of availability during his work hours and about client complaints made against him to HRA and when he received written reprimands from his supervisors concerning his work performance. Reprimands and excessive scrutiny of an employee can contribute to a finding that an adverse employment action has taken place. *Phillips*, 278 F.3d at 109. "However, courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Honey v. County of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y.2002). In other words, being advised and counseled does not, as a matter of law, constitute an adverse employment action. *See Weeks v. N.Y. State*, 273 F.3d 76, 86 (2d Cir.2001) ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action").

■ Similarly, negative evaluations standing alone without any accompanying adverse consequences are not adverse em-

ployment actions. *See id.* (finding that plaintiff did not suffer an adverse employment action when she received a counseling memo); *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 284 (S.D.N.Y. 1999) (granting summary judgment where plaintiff "fails to demonstrate that his poor performance reviews caused a materially adverse change in the conditions of his employment"), *aff'd,* 205 F.3d 1327, 2000 WL 232048 (2d Cir.2000); *see also Castro v. New York City Bd. of Educ. Personnel Dir.,* No. 96 Civ. 6314(MBM), 1998 WL 108004, at *7, 1998 U.S. Dist. LEXIS 2863, at *21 (S.D.N.Y. Mar. 12, 1998) (negative evaluations "unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions").

Here, Uddin has not alleged that any of the incidents of counseling or the memoranda concerning his work performance led to a negative rating or caused any adverse consequence. He also has conceded that he was not disciplined as a result of the counseling he received or because of the supervisory memoranda. In the absence of more tangible consequences, these actions, as a matter of law, are not materially adverse employment decisions. *See Henriquez v. Times Herald Record,* No. 96 Civ. 6176(SHS), 1997 WL 732444, at *5–6, 1997 U.S. Dist. LEXIS 18760, at *16–17 (S.D.N.Y. Nov. 25, 1997), *aff'd,* 1998 WL 781781, 1998 U.S.App. LEXIS 28272 (2d Cir.1998).

Uddin also has alleged that after he won his lawsuit against ACS, he was brought up on false charges, contending that on September 14, 2001 he was singled out for misconduct that resulted in a counseling memorandum being issued to him on September 17, 2001 and formal disciplinary charges being brought against him on or about December 12, 2001.

As laid out above, on September 14, 2001, Scott called Molina, Garcia, and Uddin into her office and confronted them. Uddin referred to the situation as "stupidity," and implied that Scott needed to "get an education." As a result of these comments, Scott requested that Uddin be disciplined for insubordination.

An informal conference was held in connection with these charges, at which time the conference holder, who was designated by the agency to hear the disciplinary case, recommended that Uddin receive a fine of three days pay. Uddin asserted his rights under the collective bargaining agreement and grieved this recommendation. On or about June 20, 2002, the grievance was denied after a Step II hearing was held on June 3, 2002. Thereafter, Uddin was fined three days pay on or about June 20, 2002.

 Although Uddin's Step III grievance was recently denied, his union requested that the case be heard by an arbitrator at a Step IV hearing. Accordingly, these charges have not been fully adjudicated. Thus, until these charges have been fully litigated, Uddin cannot establish that a final adverse action has taken place. *See Williams v. New York City Dep't of Sanitation,* No. 00 Civ. 7371(AJP), 2001 WL 1154627, at *16, 2001 U.S. Dist. LEXIS 15594, at *56 (S.D.N.Y. Sept. 28, 2001) (holding that disciplinary charges pending at the time summary judgment submitted not adverse for purposes of Title VII). The Second Circuit has held that an employee is not "adversely affected" by disciplinary charges in the workplace unless the charges are decided against him. *See Yerdon v. Henry,* 91 F.3d 370, 378 (2d Cir.1996) (if charges against an employee were ultimately dismissed "[the plaintiff] would not have suffered any adverse effect from them"); *see also Garcia v. West,* Nos. 98 Civ. 3905(RCC), 98 Civ. 5831, 99 Civ.

1370, 1999 WL 782563, at *4, 1999 U.S. Dist. LEXIS 15274, at *12 (S.D.N.Y. Sept. 30, 1999) (no adverse action when plaintiff was cleared of all charges); *Ruiz v. New York City Fire Dep't.,* No. 00 Civ. 4371(AGS), 2001 WL 767009, at *3, 2001 U.S. Dist. LEXIS 9242, at *11 (S.D.N.Y. July 9, 2001) (disciplinary measures do not constitute adverse employment actions unless they "affect ultimate employment decisions and such as promoting wages or termination"). Accordingly, as in *Yerdon* and *Williams,* until Uddin's Step IV is determined, the charges have not been conclusively adjudicated. Because his disciplinary charges remain open and that the three-day suspension is subject to reversal, these unadjudicated charges cannot form the basis of an adverse employment action.

Similarly, Uddin's allegation that Francis retaliated against him by issuing Uddin a memorandum dated October 22, 2001, as a consequence of a complaint by a client, Stephanie Range, regarding a delay in service, does not constitute an adverse employment action, as he has not demonstrated how this memorandum affected any of the terms of his employment.

Uddin also contends that "the accumulation of small reprisals may be aggregated so as to permit consideration of their impact in their totality and to support their being deemed sufficient to constitute adverse employment action ..." *See* Pl. Mem. at 12. He seeks to support this assertion by relying on cases in which the alleged adverse actions occurred immediately after the alleged protected activity. *See Fowler v. New York Transit Auth.,* No. 96 Civ. 6796(JGK), 2001 WL 83228, at *6–7, 2001 U.S. Dist. LEXIS 762, at *20–21 (S.D.N.Y. Jan. 31, 2001); *Bigelow v. New York State Dep't of Corrections,* No. 97 Civ. 460(TJM), 1997 WL 733867, at *1–2, *5–6, 1997 U.S. Dist. LEXIS 18133, at *3–4, *15–16 (N.D.N.Y. Nov. 6, 1997); *Al-

ston v. New York City Transit Auth.,* 14 F.Supp.2d 308, 310 (S.D.N.Y.1998).

■ In the instant matter, however, even considering the alleged conduct as a whole, rather than as separate incidents, it does not rise to the level of actionable harm because the alleged actions cannot be considered a series of events. The incidents of which Uddin complained occurred over the course of a year and a half and were sporadic in nature. He received various counseling memoranda for different reasons and from different supervisors over a one and a half year period, but he fails to show how they are related to one another or how they amount to an adverse employment action when considered together. Although Uddin has contended that these memoranda were false in nature, he has conceded that they did not result in any adverse consequences as they did not result in discipline or alteration of the terms and conditions of his employment.

■ Finally, Uddin contends that his removal from the civil service list for promotions amounts to an adverse employment action. Uddin contends that he was unlawfully removed from the civil service list because he was not interviewed for three positions. *See* Pl. Mem. at 18. However, Lowenstein, who was responsible for the hiring pool in December 2002, has explained that a candidate need not be interviewed to be "considered" for promotion from the civil service eligible list. Therefore, the fact that Uddin was not interviewed for a position at HASA is irrelevant. According to Lowenstein, he was "considered and not selected" three times against three separate candidates in list number order and was therefore properly not certified to HRA for further consideration from the Supervisor I (Welfare) civil service list. The allegation that the

one-in-three rule was not properly applied to him is dismissed.

Uddin alleged for the first time in connection with this motion that his name was unlawfully removed from the civil service list and therefore he was denied the opportunity to be promoted prior to December 2003. These new allegations should not be considered because they were raised for the first time in response to Defendants' moving papers. *See Beckman v. U.S. Postal Serv.*, 79 F.Supp.2d 394, 407–08 (S.D.N.Y.2000). Moreover, the evidence establishes that he was properly removed from the Supervisor I (Welfare) list in December 2002 after he was "considered but not selected" three times for a Supervisor I (Welfare) position against three other candidates in list number order. As discussed above, the one-in-three rule does not require that Uddin be interviewed to be considered three time as he suggests. Moreover, Uddin has not established that he missed any civil service hiring pools due to being removed from the civil service list.

In addition, once Uddin's name was removed from the promotional list for Supervisor I by the New York City Department of Citywide Services ("DCAS"), HRA requested that his name be restored to this Supervisor I list and Uddin has conceded that upon being restored to the civil service list, he received the next available promotion in December 2003. As such, he has not alleged that because he was decertified from the list he lost an opportunity for promotion.

With respect to Francis' alleged delay in approving Uddin's time for field visit, Uddin does not allege that this purported delay prevented him from doing his job. Moreover, his allegations relate to alleged delays that occurred eleven months after *Uddin I* was resolved. *See* Uddin Aff. ¶ 35. None of these allegations independently constitute an adverse employment action and jointly are not severe enough to rise to the level necessary to constitute an actionable harm. *See Phillips v. Bowen*, 278 F.3d 103, 109–10 (2d Cir.2002).

***Causation Has Not Been Established***

■ The fourth element of a retaliation cause of action, causation, can be established by showing that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus. *Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir.1990); *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir.1987), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). Uddin has not asserted any direct evidence of retaliatory animus. Instead he contends that a causal link between the jury verdict in his prior lawsuit and the alleged adverse employment actions is shown by: (1) the fact that the adverse employment actions followed the jury's verdict and (2) other case workers were not subject to the same adverse actions as Uddin.

The protected activity began on or about July 23, 1999 when Uddin filed his lawsuit against ACS in which he alleged national origin discrimination. In August 2001, he received a jury verdict of $60,000 in connection with his Title VII claim.

■ With respect to the disciplinary charges brought against Uddin by Scott for insubordination, Uddin has alleged that because these charges were initiated against him one month after he won his prior lawsuit, the temporal proximity alone is sufficient for him to establish an inference of retaliation. *See* Complaint ¶¶ 8(1)8(4).

Scott testified that although she was aware that Uddin had brought a lawsuit against ACS, she was not aware of the

nature of his lawsuit at the time the disciplinary charges were lodged. Because Scott testified that she did not see any newspaper articles publicizing Uddin's case until October 2001, after she had already requested disciplinary charges, Uddin has not established a causal connection between the two events. *Jetter v. Knothe Corp.*, 324 F.3d 73, 77 (2d Cir.2003) (citing *Slattery v. Swiss Reins. America Corp.*, 248 F.3d 87, 95 (2d Cir.2001) (adverse actions which take place before defendant aware of the protected activity must be dismissed)).

Further, Scott was not involved in the complaint that Uddin filed against ACS, nor has she ever been employed by ACS. *Uddin v. City*, 2001 WL 1512588, 1999 U.S. Dist. LEXIS 19373 (S.D.N.Y.2001). Accordingly, she had no incentive to "retaliate" against Uddin.

■■■ Uddin also has failed to establish a causal connection between his alleged denial of promotion claim, which accrued at the earliest in December 2002, and his victory in his prior discrimination suit in August 2001. Although there is no bright line distinction for how close in time an adverse action must be to the protected activity, courts have held the time of sixteen months to be insufficient. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing with approval cases dismissing retaliation claims where there were three and four month periods between protected activity and adverse employment action, noting the temporal proximity must be "very close"); *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.1990) (period of three months between the protected act and the adverse act is not sufficiently close in time to show causal connection).

Uddin has also failed to establish any evidence establishing a link between the denial of promotion and his alleged protected activity. Alexander interviewed Uddin on December 20, 2002 and was the sole decision-maker for whether to promote him to a Supervisor I position. At the outset, Uddin has not alleged that Alexander retaliated against him. Moreover, the facts establish that Alexander had no knowledge of Uddin's discrimination claims against ACS. Alexander testified that she relied on the personnel who managed the civil service pool to provide her with information regarding each of the candidates that she interviewed. Lowenstein also testified that she was unaware of Uddin's claims against ACS and HRS. Alexander also testified that she asked Uddin the same questions that she asked all candidates, and she selected a candidate for appointment based on the candidate's answers to those questions. Therefore, even assuming Uddin suffered an adverse employment action by virtue of being denied a promotion, he has failed to establish that such denial was a result of retaliatory animus.

According to Uddin, he also applied for several administrative staff analyst positions. He alleges that he was not offered any of these positions in retaliation for his prior discrimination lawsuit. However, most of these applications were submitted after August 1, 2002 and as discussed above, the intervening twelve-month period between his alleged protected activity and being denied an administrative staff analyst position negates any inference that he was denied these vacancies as a result of protected activity. *See Clark County Sch. Dist.*, 532 U.S. at 273, 121 S.Ct. 1508; *Hollander*, 895 F.2d at 85. Moreover, the only administrative staff analyst flyer that Uddin applied to prior to that time was on October 29, 2001, and the evidence establishes that Uddin was offered the position but declined to accept it.

Even if it is assumed that the counseling memoranda issued to Uddin, the alleged denial of telephone, and the denial of Uddin's choice of supervisor were adverse actions, Uddin has not established that these alleged actions were the result of his protected activity. First, as discussed above, neither Scott nor Francis were aware of Uddin's lawsuit until September 2001. The memoranda in 2001–02, the denial of a phone from 2002 until 2003, and denial to be placed under the supervisor of his choice in 2000 and in May 2002, are too temporally remote to give rise to an inference of retaliation. Further, alleged adverse memoranda issued to Uddin in 2000 until July 2001 are also too temporally remote in time to the date that Uddin initiated his lawsuit, July 23, 1999, to give rise to an inference of retaliation. *See, e.g., Clark County Sch. Dist.,* 532 U.S. at 273, 121 S.Ct. 1508 (citing with approval cases dismissing retaliation claims where there were three and four month periods between protected activity and adverse employment action, noting the temporal proximity must be "very close"); *Hollander,* 895 F.2d at 85 (period of three months between the protected act and the adverse act is not sufficiently close in time to show causal connection).

■ Additionally, Uddin has failed to show that he was subjected to these allegedly adverse employment actions for reasons which give rise to an inference of retaliation. *See Lumhoo v. Home Depot USA,* 229 F.Supp.2d 121, 140 (E.D.N.Y. 2002). Uddin cannot establish that he was treated any differently than any other caseworker or union delegate. Although Uddin makes conclusory allegations about his treatment, such allegations without admissible evidence cannot suffice to oppose a motion for summary judgment. There must be more evidence than plaintiff's own speculations. *Wyler v. United States,* 725 F.2d 156 (2d Cir.1983).

Neither Scott nor Francis had any knowledge of *Uddin I* until October 2001 and they had no knowledge of the nature of Uddin's lawsuit during the time that any of the alleged retaliatory actions took place. Moreover, individuals who denied Uddin a promotion in December 2002 had no knowledge of *Uddin I.*

■ Any alleged actions that took place more than nine months after the last alleged protected activity, *i.e.,* after May 2002, are too remote to establish a causal connection. Thus, Uddin's retaliation claims based on being denied a promotion from August 2002 through November 2003 and in December 2002, any delayed approval of his field visit time in the summer of 2002, and any counseling memoranda issued after May 2002, are temporally too remote to establish the requisite causation.

### Conclusion

Uddin has conceded that the § 1983 claim is withdrawn (Pl. Mem. p. 2). For the reasons set forth above, Uddin has failed to make out a *prima facie* case of retaliation. Accordingly, the motion of the Defendants for summary judgment is granted and the complaint is dismissed. Submit judgment on notice.

It is so ordered.