Ruben NIDZON, Plaintiff,

v.

KONICA MINOLTA BUSINESS
SOLUTIONS, USA, INC.,
Defendant.

No. 07–CV–3724 (BSJ)(AJP).

United States District Court,
S.D. New York.

Oct. 22, 2010.

Sheldon H. Gopstein, Law Office of Sheldon H. Gopstein, Esq., New York, NY, for Plaintiff.

Loren Gesinsky, Gibbons P.C., New York, NY, Alychia Lynn Buchan, Gibbons P.C., Newark, NJ, for Defendant.

### Memorandum & Order

BARBARA S. JONES, District Judge.

Plaintiff Ruben Nidzon brings this lawsuit for employment discrimination against Defendant Konica Minolta Business Solutions, USA, Inc. ("KMBS") on the basis of religion and unlawful retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2 ("Title VII"), as well as claims under New York State Human Rights Law ("NYSHRL") Executive Law § 296, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code § 8–101 *et seq.*

Plaintiff, a former employee of KMBS, alleges that he was treated adversely and ultimately terminated by KMBS because he is Jewish. Plaintiff also asserts that this negative treatment by KMBS was in retaliation for his complaints to KMBS management about a discriminatory comment made by his supervisor. Before the Court is Defendant's May 22, 2009 motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendant's motion is GRANTED in part and DENIED in part.

## STATEMENT OF FACTS

■ At the outset, the Court notes that Plaintiff has submitted an affidavit sworn after the conclusion of his deposition testimony. In this circuit, "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior testimony." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.2001). Accordingly, statements of fact made for the first time in Plaintiff's affidavit and which contradict his prior testimony will not be permitted to controvert Defendant's properly supported statements of material facts. Rather, in those instances, Defendant's statements will be deemed admitted for the purposes of this motion, pursuant to the local rule.[1] The following facts are undisputed unless otherwise noted.

In 1988, Nidzon began his employment with KMBS predecessor Minolta Business Solutions ("Minolta"). (Defendant's Rule 56.1 Statement ¶ 2.) He voluntarily left the company in 1998 and was rehired in 1999 as a color technician with the Manhattan branch. (Def.'s 56.1 Stmt. ¶ 2.) As color technician, Plaintiff's main job responsibility was to service Minolta equipment at customer locations. (Def.'s 56.1 Stmt. ¶ 9.) He was known as one of the most skilled technicians in the Manhattan branch, and generally received positive performance evaluations. (Annual Reviews of Ruben Nidzon 1999–2005, Pl.'s Ex. 1.) Nidzon admits that prior to 2004, he was an employee who would often speak his mind, sometimes "cursing and yelling" at others in the workplace if they yelled or used profanity towards him. (Nidzon Dep. 215:11–219:25.) He was promoted to Parts Room Manager in March 2003. (Def.'s 56.1 Stmt. ¶ 5.)

In October 2003, Konica Business Technologies ("Konica") and Minolta legally merged to form KMBS. KMBS sells and services advanced imaging and networking technologies, through branch offices in Manhattan and elsewhere. (Def.'s 56.1 Stmt. ¶ 1.) Konica and Minolta's service groups officially merged on April 1, 2004. (Def.'s 56.1 Stmt. ¶ 1.) From that point forward, Nidzon was employed and managed by KMBS.

Because of this consolidation of operations and the implementation of a new parts system, KMBS management decided to eliminate one Manhattan parts position,

1. See Rule 56.1, Local Rules of the United States District Court for the Southern and Eastern Districts of New York (emphasis added), *"(c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for the purposes of the motion unless specifically controverted by a correspondingly numbered para-* *graph required to be served by the opposing party.* (d) Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by a citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)."

choosing Nidzon's role for elimination. However, he was offered the opportunity to continue his employment with KMBS by returning to his former field technician position, an offer he accepted on May 3, 2004. (Def.'s 56.1 Stmt. ¶ 8.)

As a field technician, Nidzon was supervised directly by a Field Technical Manager. Nelson Candelario filled this position from May 2004 until early August 2004, and Steven Blackwell took over from August 2004 until Nidzon's termination in February 2006. Clyde Siriram, Branch Technical Manager, directly supervised the area's five Field Technical Managers and oversaw the branch's technical operations. (Def.'s 56.1 Stmt. ¶¶ 7, 11.)

After the KMBS merger was fully implemented, management instituted a number of changes to the department's policies. Technicians were now required to be clean shaven when working and were scheduled for a longer work day without a pay raise. (Defendant's 56.1 Stmt. ¶ 15; Nidzon Dep., 331:3–332:11, July 30, 2008.) Additionally, no technician was allowed to service a new model or type of machine without first receiving some training on that equipment. (Def.'s 56.1 Stmt. ¶ 38; Letter from Human Resources to Ruben Nidzon, Pl.'s Ex. 8; Nelson Candelario Dep. 44:20–46:15, April 15, 2009.)

On July 8, 2004, all color technicians met with Clyde Siriram regarding these policy changes and the general billing practices of the division. (Def.'s 56.1 Stmt. ¶ 15; Clyde Siriram Dep., 43:12–44:16, December 18, 2008.) Siriram explained the changes and was met with resistance from a number of the technicians, including Plaintiff Nidzon. A disagreement ensued, and Siriram began yelling at Nidzon in front of the group, calling him a "pussy" and "a coward." (Nidzon Dep. 400:3–20.) Siriram continued, "I want the billing because I'm Indian and we're cheap, cheaper

than Jews, and you know how cheap Jews are." (Nidzon Dep. 400:22–24.) Nidzon was the only Jewish employee in the meeting. Afterwards, he discussed the incident with co-workers and decided to file a complaint. The next day, he called Human Resources and spoke to Andrea Fuchs. (Def.'s 56.1 Stmt. ¶ 22.) At her request, he emailed an account of the incident to Staffing and Employee Relations Specialist Andrea Comstock–Tague ("Tague") a few days later. (Email from Nidzon to Tague, Pl.'s Exhibit 4.)

After receiving Nidzon's email, Tague contacted Nidzon to discuss the incident further. Tague's notes document the conversation. (Tague Notes, Def.'s Ex. 4.) Nidzon expressed that Siriram often bullies the technicians, and that the two are often in conflict because Nidzon spoke out against company policies. Nidzon admitted at his deposition that he told Tague that "he [Siriram] wouldn't talk to me like that if he met me on the streets." He also said that he "didn't have to take that shit" from Siriram. (Def.'s 56.1 Stmt. ¶ 26; Nidzon Dep. 462:3–463:7.) Tague then spoke to Siriram about the incident. Siriram admitted making a comment about Jews and Indians. (Def.'s 56.1 Stmt. ¶ 27.) Tague reported the substance of both calls to her supervisor Don Warwick, Vice President for Human Resources. (Def.'s 56.1 Stmt. ¶ 28.)

Subsequently, a meeting was held by conference call on August 2, 2004 with Warwick, Tague, Nidzon, Siriram and Nelson Candelario, Nidzon's former field manager. (Def.'s 56.1 Stmt. ¶ 29.) Warwick attempted to explain that Siriram's remarks were intended as a joke he had previously made with a Jewish friend. (Def.'s 56.1 Stmt. ¶ 29.) Additionally, Nidzon disputes that Siriram was ever actually reprimanded during the meeting. However, Candelario recalled that Siriram was instructed by Warwick to speak to

professionally to all employees. (Candelario Dep. 88:12–24.) Warwick then reprimanded Nidzon for his "borderline insubordinate" behavior in his handling of the matter, focusing especially on his comments to Tague about Siriram. (Def.'s 56.1 Stmt. ¶ 29; Donald Warwick, Dep. 97:17–98:11, 66:1–67:5, Dec. 15, 2008.)

Nidzon asserts that "right after" he complained, managers began visiting customers whose machines Nidzon had recently serviced to check up on his work, as often as three times per week. (Nidzon Dep. 512:1–514:24.) Plaintiff says he found out about these audits because his co-workers and customers told him he was being followed, but he supplies no admissible evidence in support of this assertion. (Nidzon Dep. 165:9–168:16.) For its part, KMBS has produced business records listing technician audits conducted from July 1, 2004 to 2006. These records show that Plaintiff was audited twelve times during this period, and that this number was less than the number of audits for most other technicians. (KMBS Audit Tracking Report 2005–06, Def.'s Ex. 28; KMBS Audit Tracking Report, 2004–05, Def.'s Ex. 5.)

Nidzon also complains that beginning in the fall of 2004 he was sent out of his territory more often than other technicians, thus decreasing his productivity. KMBS's regular practice was to send technicians out of their territory whenever necessary, to balance workloads or to match technicians with the jobs they were qualified to handle. (Def.'s 56.1 Stmt. ¶ 40.) They admit that Nidzon may have been sent out of his territory more often than other technicians, but explain that because Nidzon was not certified on all equipment, he could only handle jobs on certain models. (Def.'s 56.1 Stmt. ¶ 40; Steven Blackwell Deposition, 155:17–23, Nov. 20, 2008.) Nidzon does not dispute that he was not certified on all equipment models. (Nidzon Dep. 624:2–625:2.)

In early January 2005, Nidzon requested a review from Siriram, as he had a few times in the months prior, believing it should have been administered in late 2004. He recalled that Siriram replied, "You need a review? Don't Jews have enough money?" (Nidzon Dep. 494:11–496:20.) Because of his prior negative experience with reporting a complaint against Siriram, Nidzon did not report the incident to Human Resources. (Nidzon Dep. 494:11–496:20; Def.'s 56.1 Stmt. ¶ 32.)

Shortly thereafter, when Plaintiff received his salary review effective January 5, 2005, he was denied a salary increase. (Def.'s 56.1 Stmt. ¶ 33; Employee Change Form for Ruben Nidzon, Def.'s Ex. 32.) His written performance evaluation, completed by Blackwell on May 15, 2005, awarded Nidzon an overall grade of "Satisfactory." (Technician Evaluation Form for Ruben Nidzon, Def.'s Ex. 7.) The review commended Nidzon's dedication to customer satisfaction and success in recently completed trainings. It also noted that, "[Nidzon] needs to be trained on additional machines so that he can continue to be technically up-to-date with the company" and so that his productivity rating will increase. (Id.) Finally, it criticized Nidzon for his poor communication with managers and lack of professionalism. (Id.)

In early 2005, KMBS began strictly enforcing its policy requiring all technicians to have at least begun training classes for all new equipment models before servicing that type of copier. (Def.'s 56.1 Stmt. ¶ 38.) Nidzon asserts that management applied the policy requiring technicians to receive training on any new machines prior to servicing them more harshly to him than to other experienced technicians. He contends that he was the only experienced technician to whom the policy was strictly applied. Plaintiff complained of this in a March 14, 2005 email to Donald Warwick,

stating "Siriram has stopped me from working on machines that I am not trained on. Which is all the machines except for the 900 series." (March 14, 2005 Email from Ruben Nidzon to Donald Warwick, Pl.'s Ex. 7.) James Serrano testified that the policy was first applied to Nidzon, and later applied to all experienced technicians. (Serrano Dep. 119:22–122:21.) When asked why only Nidzon was initially prevented from working on machines that he had not received training on, Serrano recalled that Nidzon was prevented from working on those machines after he complained about how technicians were responsible for servicing machines they had never been trained on. (Serrano Dep. 33:2–13.)

On February 25, 2005, Nidzon requested a week of vacation time in March and a week in April of that year. He was informed approximately ten days later that his April request was approved, but his March request was denied. (Def.'s 56.1 Stmt. ¶ 36; March 18, 2005 Letter from Human Resources to Nidzon, Def.'s Ex. 36.) KMBS had advised technicians in October 2004 that employees who wanted to take spring vacation were required to obtain manager approval. Any such requests were supposed to be submitted far in advance, due to the frequency of requests at that time of year and the heavy workload during tax season. (Def.'s 56.1 Stmt. ¶¶ 34–35.) Nidzon responded to the denial of his vacation request by emailing a Human Resources representative asking whether his vacation would be "stolen" from him. (March 8, 2005 Email from Nidzon to Human Resources, Def.'s Ex. 33; March 25, 2005 Email from Nidzon to Donald Warwick, Def.'s Ex. 20.) Plaintiff went on to complain about the KMBS training policy, arguing that he was "harassed" by Siriram. (Id.)

Human Resources Specialist Tague responded to these complaints in a letter dated March 18, 2005. (Def.'s 56.1 Stmt. ¶ 36; March 18, 2005 Letter from Human Resources to Nidzon, Def.'s Ex. 36.) Tague reiterated that KMBS policy required training for all technicians, with only rare exceptions. She stated that Blackwell made a decision as manager that Nidzon needed more training before he could work on new machines. Finally, she urged Nidzon to pick up more calls outside of his territory to increase his productivity. (Id.) In response to Nidzon's vacation complaint, Tague reiterated that March was an especially busy season for the branch, and that a number of employees were signed up to complete training during that week. (Id.) KMBS later granted Plaintiff permission to carry over his vacation days to the next year, an exception to the usual KMBS policy. (Final Letter of Warning, Def.'s Ex. 39.)

On March 10, 2005, Blackwell wrote an email to Human Resources documenting his increasing conflicts with Nidzon. (March 10, 2005 Email from Blackwell to Human Resources, Def.'s Ex. 37.) He reported that Nidzon had "verbally abused" him, frequently made negative remarks about the company, and negatively impacted the team of technicians. Further, Blackwell wrote that Nidzon made threatening comments to him, including, "I'll fix you all," "you all gonna pay," and "just wait its coming." (Id.) In response to these issues, members of the Human Resources department and KMBS executive Tom Dillon spoke to Nidzon. (Def.'s 56.1 Stmt. 141.) Nidzon complained that he wasn't able to complete trainings at home like other technicians because of his poor internet connection. Nidzon also said that he had taped a recent conversation with Blackwell because Blackwell "lied". He went on to assert that management "condoned bigotry" and that he could not trust any manager at KMBS. (Def.'s 56.1 ¶¶ 41, 42; Buffing Notes, Def.'s Ex. 38.)

After Blackwell's email and the meeting with Human Resources, Warwick and his staff initiated an investigation into Nidzon's performance at KMBS. (Def.'s 56.1 Stmt. ¶ 43.) After the investigation was complete, Warwick sent a "Final Letter of Warning" to Nidzon on April 22, 2005. (Def.'s 56.1 Stmt. 144; Final Letter of Warning, Def.'s Ex. 39.) The letter first commended Nidzon on his recent attendance at a training session and his positive interactions with customers. Warwick then provided multiple examples of Nidzon's "disrespectful" behavior towards KMBS management and staff, as well as his "unwillingness to conform to reasonable company policies and practices." (*Id.* at 2.) These included: disruptive and disrespectful remarks at bi-weekly technical meetings, refusal to participate in the required annual one-on-one meeting between manager and technician, unwillingness to assist other technicians by taking calls in other territories, and making threatening comments to his managers. The letter urged Nidzon to improve these behaviors, because KMBS believed that Nidzon could "make a meaningful contribution as Color Specialist." (*Id.* at 1.) In the conclusion of the letter, Nidzon was warned that any further incidents of insubordination would result in termination. (*Id.* at 3.) A copy of the warning letter was sent to various managers, including Siriram, Blackwell, and other supervising executives at KMBS. (*Id.* at 3.) The letter was given to Nidzon at a meeting with Warwick, Siriram, Blackwell, and Joe Flynn, a KMBS supervisor. Nidzon refused to sign the letter to acknowledge its receipt. (*Id.* at 3.)

Nidzon generally denies the insubordinate conduct described in the Final Letter of Warning, calling such allegations "false" and "untrue." (Pl.'s Aff. ¶ 20.) Nidzon only specifically denied the allegations that he refused certain jobs and that he threatened his managers. (*Id.*) Additionally, Nidzon does not dispute that this conduct was actually reported to Human Resources.

In late December 2005, Blackwell sent Nidzon a "Letter of Concern" after he failed to comply with the department policy requiring manager approval before ordering parts. (Def.'s 56.1 Stmt. ¶ 45; Letter of Concern, Pl.'s Ex. 40.) Nidzon admits that he did not comply with the policy, though he asserts that his manager Blackwell refused to answer his calls, effectively forcing him to break the rule. (Nidzon Dep. 490:3–491:14.)

In February 2006, during a team meeting, Blackwell reminded technicians about the KMBS vacation policy. (Def.'s 56.1 Stmt. ¶ 46.) He reported to Human Resources that Nidzon replied, "You are not taking my vacation time from me." After the meeting, when given a service appointment outside of his territory, Blackwell stated that Nidzon refused to complete the call and used profanity in telling Blackwell that he "wouldn't pick up people's garbage." (Def.'s 56.1 Stmt. ¶ 46; Notes from Human Resources Investigation February 13, 2006, Def.'s Ex. 41.) Blackwell reported the incident to Human Resources. (Def.'s 56.1 Stmt. 147.) Two technicians at the meeting recalled that Nidzon was "shouting" and "cursing." They further described his conduct as "explosive" and the "worst outburst I had ever seen towards Steve." (Def.'s 56.1 Stmt. ¶ 46; Alfaro Affidavit ¶ 5; Serrano Aff. ¶ 25.) Nidzon does not deny or refute these allegations, and testified that he "had a few disputes with Steve at meetings." (Nidzon Dep., 663:12–23.) [2]

---

**2.** Plaintiff's 56.1 Statement as to Paragraph 46 makes a general denial, citing only to a statement in Nidzon's affidavit that he never engaged in disrespectful or unprofessional be-

Shortly thereafter, Nidzon requested a transfer to the New Jersey KMBS branch, emailing Blackwell, "I am formally requesting a transfer to Totowa since my first verbal request was ignored." (Email from Nidzon to Blackwell, Def.'s Ex. 43.) Management decided to deny Nidzon's request due to his pending disciplinary problems in the Manhattan location, in accordance with KMBS policy. (Def.'s 56.1 Stmt. ¶ 48; Warwick Dep. 220:4–15.) During the same period, Nidzon was again denied a salary increase. (Nidzon Employee Change Form, Def.'s Ex. 11.)

In response to Blackwell's report, Human Resources commenced another investigation into Nidzon's behavior, led by staff member Edward Satokwsi. (Def.'s 56.1 Stmt. ¶ 49.) Satokwsi interviewed a number of KMBS employees, including Nidzon, Blackwell, other KMBS managers, and three technicians on Nidzon's team. (*Id.*) Warwick, Siriram, Blackwell, and KMBS executives Paul Ambrose and Tom Dillon discussed how to deal with Nidzon's behavior. They agreed that the situation had worsened and that the best decision for KMBS was to terminate Nidzon for insubordination. (*Id.*) It is unclear from the materials provided whether Human Resources or upper management (namely Ambrose and Dillon) made the final decision to terminate. (Warwick Dep. 224:2–227:25.) Siriram was not the final decision maker, but participated in the decision. (Siriram Dep. 169:11–19; Warwick Dep. 224:2–227:25.) Nidzon was officially terminated on February 17, 2006. KMBS payroll paperwork indicated that the reason was "insubordination." (Def.'s 56.1 Stmt. ¶ 49; February 17, 2006 KMBS Salary Payroll Action Request for Ruben Nidzon, Pl.'s Ex. 44.)

havior. (Nidzon Aff. ¶ 24.) Plaintiff has failed to cite to admissible evidence specifical-

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(c), summary judgment may not be granted unless all of the submissions taken together show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of a material factual question. In making this determination, a court must view all facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all inferences against the moving party. *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir.2006). Although the Second Circuit has emphasized the need for district courts to act with caution when considering whether to grant summary judgment to an employer in an employment discrimination case, a plaintiff must provide more than "conclusory allegations ... and show more than some metaphysical doubt as to the material facts." *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir.2010) (internal citations and quotations omitted). A defendant will be entitled to summary judgment unless the plaintiff "can point to evidence that reasonably supports a finding of prohibited discrimination." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir.2006).

**DISCUSSION**

Plaintiff Nidzon brings claims against KMBS under Title VII, NYSHRL, and the NYCHRL for (1) religious discrimination affecting Nidzon's compensation, terms and conditions of his employment, and culminating in his eventual termination and (2) unlawful retaliation by KMBS against Nidzon after he made an internal complaint about this religious discrimination.

ly refuting Defendant's statement of facts in Paragraph 46.

## I. Religious Discrimination

First, Plaintiff contends that because of religious animus against him as a member of the Jewish religion, he was subject to months of discriminatory treatment culminating in his termination. Specifically, he alleges that twice Branch Technical Manager Siriram made disparaging comments to him about his Jewish heritage. In the July 8, 2004 staff meeting, Siriram, speaking about the need to consistently bill clients, looked directly at Nidzon and said, "I want you to know right now that we Indians are cheaper than the Jews, and you know how cheap the Jews are." Several months later, in January 2 005, after Nidzon requested his annual performance review, Siriram said to him, "You need a review? Don't you Jews have enough money." Nidzon's complaint asserts that these comments were accompanied by changes to the conditions of his employment. He alleges that despite his strong record of performance at KMBS, he was subjected to a series of negative employment actions culminating in his termination.

### A. *Prima Facie* Case of Employment Discrimination

■ Claims of employment discrimination brought under Title VII are examined under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this analysis, the plaintiff must first establish a *prima facie* case of discrimination based on religion. If a plaintiff establishes the required elements, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for the allegedly discriminatory act. *Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir.2001). If the defendant can provide such a reason, the burden shifts back to plaintiff to point to evidence that "reasonably supports a finding of prohibited discrimination." If plaintiff is unable to provide such evidence, defendant will be entitled to summary judgment. *Farias*, 259 F.3d at 98.

■ To establish a *prima facie* case, Plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was qualified for the position or is performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) that action occurred under circumstances giving rise to an inference of discriminatory intent. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

■ Here, Plaintiff easily has met this de minimis burden for elements one, two, and four. Nidzon is a member of the Jewish faith, a protected class under Title VII. His 2000–2005 performance reviews indicate that he received at least a rating of "satisfactory" every year, indicating he was performing acceptably. The two statements made by Clyde Siriram give rise to an inference of discriminatory intent. As to the third element, whether Nidzon has demonstrated an adverse employment action, Plaintiff has sufficiently demonstrated that some but not all of the complained of actions by KMBS were adverse employment actions.

### 1. Adverse Employment Actions

To establish a case of employment discrimination, a plaintiff must show that he suffered an adverse employment action. Nidzon alleges: (1) that he was denied training opportunities, (2) that KMBS training requirements were enforced more strictly against him than other technicians, causing him to have to complete assignments out of his territory more frequently than his peers, (3) that he was denied a vacation request, (4) that he received more frequent audits by management, (5) that he was denied a lateral transfer, (6) that he was denied a raise twice, and (7) that he was ultimately terminated.

■■■ An adverse employment action is defined in the Second Circuit as a "materially adverse change in the terms and conditions of employment." *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.1997). To be materially adverse, a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Sanders v. New York City Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir.2004). Examples may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities." *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003).

■■■ Under this standard, Plaintiff's termination clearly qualifies as an adverse employment action. Under the law of the Second Circuit, the denial of a salary increase is also sufficiently material to constitute an adverse employment action. (*Bennett,* 136 F.Supp.2d at 250); *Magilton v. Tocco,* 379 F.Supp.2d 495, 503 (S.D.N.Y. 2005). Nidzon's 2005 and 2006 denials of a salary increase thus rise to the level of adverse employment actions.

■■■ As to the remaining claims, the Court finds that the evidence is insufficient to establish that any rise to the level of an adverse employment action. In addition, the Court notes that in some cases there is insufficient evidence that the complained of employer conduct actually occurred. In other instances, there is no evidence of discriminatory intent motivating the complained of conduct.

First, Plaintiff alleges that he was denied the opportunity to complete training sessions that would increase his productivity. KMBS has produced evidence that Plaintiff was provided the same training opportunities as other technicians, but that individual circumstances delayed his completion of the training sessions as quickly as other employees. Plaintiff admits that

KMBS management urged him to complete the required training sessions. (Nidzon Dep. 341:11–23.) Plaintiff also admits that he could not complete trainings as quickly as other employees because he did not have a high-speed home internet connection, and that eventually KMBS provided him with the opportunity to complete trainings in the office. (Nidzon Dep. 341:11–342:9.) Moreover, Plaintiff was unable to complete his first scheduled in-person training session in January 2005 because of a family emergency. (Nidzon Dep. 633:3–9.)

■■■ To successfully establish denial of training opportunities as an adverse employment action, a plaintiff must demonstrate that the employer offered training to other employees and that he was denied training under circumstances giving rise to an inference of discrimination. *Ani v. IMI Systems, Inc.,* 2002 WL 1888873 at \*5 (S.D.N.Y. August 15, 2002). Plaintiff has presented no evidence that he was denied training opportunities provided to other KMBS employees. Therefore, this does not constitute an adverse employment action.

■■■ Second, Plaintiff alleges that the company policy requiring Plaintiff to complete training on any equipment model before servicing that type of machine was applied more harshly to him than to other experienced technicians. KMBS has produced evidence that managers Blackwell and Siriram applied the policy fairly to Nidzon based on his skill level and training. First, Defendant explains that the policy was implemented for the first time in early 2005 and gradually enforced against all employees in an effort to improve the technical skill of the entire branch. (Def.'s 56.1 Stmt. ¶ 38.) Siriram and Blackwell, Nidzon's managers, testified that Nidzon was initially allowed to service all machines but was eventually

limited to certain models because of the delays in his training and their own doubts about his technical competence. (Siriram Dep. 87:22–89:5; Blackwell Dep. 123:23–29:22.) Further, the policy was eventually applied to all employees. (Serrano Dep. 123:19–124:16.) Only "on occasion" were technicians allowed to work on equipment without training on that model. (Kakeh Dep. 10:18–11:18.) As discussed in the paragraph above, Plaintiff cannot show he was prevented by his managers from completing the necessary trainings to increase his own productivity. Nidzon has therefore failed to produce evidence that the policy was applied unfairly to him. The assignment of tasks that are within the description or duties of the position, even if less desirable, do not rise to the level of an adverse employment action. *Figueroa v. New York City Health and Hospitals Corp.*, 2007 WL 2274253 at *5 (S.D.N.Y. 2007). *See also Smalls v. Allstate Ins. Co.*, 396 F.Supp.2d 364, 371 (S.D.N.Y.2005).

Third, KMBS denied Nidzon's February 25, 2005 request to take vacation during the last week in March of that year. Though he asserts that this was because of animosity towards him from his managers, he fails to produce any evidence to show that he was treated differently than other employees who requested vacation less than a month in advance. KMBS has shown that in October 2004 managers began warning technicians that vacation requests for March and April would require special approval and should be made far in advance. (Def.'s 56.1 Stmt. ¶ 34.) Plaintiff fails to show any motive for the denial other than to ensure KMBS had an adequate staff of technicians during a busy period. (Def.'s 56.1 Stmt. ¶¶ 34, 35.) Even if Nidzon's allegations were true, the denial of a vacation request does not rise to the level of an adverse employment action. *Baptiste v. Cushman & Wakefield*, No 03 Civ. 2102, 2007 WL 747796 at *25 (S.D.N.Y. Mar. 7, 2007).

Fourth, Plaintiff alleges that he experienced an adverse employment action when he was the subject of increased scrutiny. He says that Siriram and Blackwell followed up on his customer appointments more often than they did for other employees, as often as three times per week beginning after his July 2004 complaint to Human Resources and lasting for an unspecified number of months. KMBS admits that a new audit program began in the summer of 2004, with the goal of better monitoring technician performance. (Def.'s 56.1 Stmt. ¶ 12.) It has produced business records showing that in the 18 month period at issue, Nidzon was audited twelve times, less than the majority of technicians. (KMBS Audit Tracking Report, Def.'s Ex. 5.) Nidzon's only evidence in support of his claims is that he named one customer at his deposition who told him that two KMBS managers matching Siriram and Blackwell's descriptions had come to check up on him. (Nidzon Dep. 165:22–167:16.) His co-worker James Serrano reported hearing that there were visits made by managers from three of Nidzon's customers. (Serrano Dep. 96:24–98:24.) While KMBS admits that audits of Nidzon were conducted beginning in the summer of 2004, Plaintiff has produced no customer affidavits or other evidence raising a genuine issue of fact as to a repeated pattern of excessive visits or audits.

■ Even if he were able to produce such evidence, excessive scrutiny without a tangible negative consequence to the employee does not rise to the level of an adverse employment action. *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y.2001). Plaintiff has failed to allege any tangible adverse consequences from this increased oversight other than his own annoyance, and therefore this allegation could not rise to the level of an adverse employment action.

Five, Nidzon asserts that he was unfairly denied a transfer to another KMBS branch. KMBS' policy prevents employees with pending disciplinary issues from transferring to other branches. (Def.'s 56.1 Stmt. ¶ 48.) Other than his own suspicions, Plaintiff has produced no evidence of any discriminatory motive. Even if Plaintiff's allegations were true, denial of a lateral transfer is not an adverse employment action. *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir.2004).

Therefore, all of Nidzon's alleged adverse employment actions fail except for his 2006 termination and his denial of a salary increase in 2005 and 2006.

### B. *McDonnell Douglas* Burden Shifting Framework

As discussed above, Plaintiff has met the de minimis burden required by Title VII and established a *prima facie* case of employment discrimination regarding the denial of a salary increase in 2005 and 2006 and his termination. The burden then shifts to the Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination and denial of a salary increase. Defendant KMBS has presented admissible evidence that Nidzon was fired because of his repeated instances of insubordinate behavior, verified by numerous witnesses in affidavits and deposition testimony. (*See* Tague Affidavit ¶¶ 16–20; Mayo Affidavit ¶ 29; Candelario Dep. 58:1–25; Dillon Dep. 78:17–24; Warwick Dep. 173:2–176:23.) They have also produced documents explaining that Nidzon's raise was denied because of his decreased productivity in 2004. Therefore, Defendant has successfully articulated a legitimate, non-discriminatory reason for Plaintiff's termination, thus shifting the burden back to Plaintiff to show that this reason is pretextual.

To avoid summary judgment, Plaintiff must identify evidence that would allow a reasonable fact finder to conclude that "the legitimate, non-discriminatory reasons proffered by the defendants were false, and that more likely than not [discrimination] was the real reason" for the adverse action. *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir.2000) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996)).

Here, Plaintiff only presents the two comments made by Clyde Siriram to establish that Defendant's non-discriminatory reason for Nidzon's denial of a raise and termination was mere pretext. Verbal comments can support a finding of discriminatory intent when "a plaintiff demonstrates that a nexus exists between the allegedly discriminatory comments and defendant's decision to discharge the plaintiff." *Pronin v. Raffi Custom Photo Lab., Inc.*, 383 F.Supp.2d 628, 636 (S.D.N.Y. 2005). However, such comments can also be classified as merely "stray remarks", which generally "do not constitute sufficient evidence to support a case of employment discrimination." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir.1998).

To determine whether a comment is a "stray remark", courts examine whether the comment was made by a decision maker, whether the comment related to the employment decision at issue, and the closeness in time of the action and the remark. *Pronin*, 383 F.Supp.2d at 637. Regarding the termination decision, the two comments at issue qualify as "stray remarks." Nidzon's termination was 19 months after the first comment and 13 months after the second comment. Siriram, the speaker, participated in the discussion regarding Nidzon's termination, but was not the final or sole decision maker. The comment was not related to the decision to terminate. The termination

decision was made after repeated instances of insubordination by Mr. Nidzon, many of which he essentially admitted to at his deposition. The incidents were documented by KMBS in the April 2005 Final Warning letter, emails, and notes by Human Resources staff members. These documents illustrate that Nidzon was warned that if his insubordinate behavior continued, it would result in his termination from KMBS. (Def.'s 56.1 Stmt. ¶ 44.) Because these stray remarks do not constitute sufficient evidence to give rise to an inference that Nidzon was terminated because of religious discrimination, Plaintiff's termination claim fails.

■■ Similarly, Plaintiff was denied a raise in January 2006, thirteen months after the second discriminatory comment. The lapse in time between the comment and the adverse action is too great to infer a discriminatory motive, and the comment therefore qualifies as a stray remark. As a result, Plaintiff fails to establish that the non-discriminatory reason given for Nidzon's denial of a salary increase in 2006 was pretext.

■■ However, as to the alleged January 2005 comment by Siriram regarding Nidzon's 2005 salary review only, the comment does not qualify as a stray remark. The comment directly addressed Mr. Nidzon's compensation and was made close in time to the review at which he was denied a raise, which Blackwell administered and Siriram approved. Even though one stray remark by itself is not usually sufficient proof of discrimination, it is plausible that

a fact finder could reasonably find that Siriram did make such a statement and that the statement demonstrates his discriminatory intent in denying Nidzon a raise. Therefore, Defendant's motion for summary judgment is granted as to Plaintiff's claims of wrongful termination and the January 2006 denial of a raise, but denied as to Plaintiff's claim that he was discriminatorily denied a raise because of his religion in January of 2005 only.[3]

## II. Unlawful Retaliation

Plaintiff next contends that he was unlawfully retaliated against because he complained to Human Resources about Siriram's comment at the July 8, 2004 team meeting. Specifically, he contends that once he reported the comment to Human Resources, he was subjected to a series of adverse employment actions, including his eventual termination.

### A. *Prima Facie* Case of Retaliation

■■ To establish a *prima facie* case for retaliation, Plaintiff must show that (1) he engaged in a protected activity, (2) the employer was aware of this activity, (3) an adverse employment action was taken, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Schiano v. Quality Payroll Systems,* 445 F.3d 597, 608 (2d Cir.2006). Here, Plaintiff has established his *prima facie* case with respect to the 2005 denial of a salary increase only. He engaged in a protected activity when

**3.** Although this analysis applies the standard governing Title VII claims, the same standard applies to Nidzon's discrimination claim under New York state law. *Patane v. Clark,* 508 F.3d 106, 113 (2d Cir.2007) ("New York courts examine claims under those statutes with the same analytical lens as corresponding Title VII—based claims.") The Court has also considered Plaintiff's arguments that Defendant discriminated against Plaintiff under the more liberal standard of the NYCHRL. In light of the 2005 Restoration Act, we have independently construed such claims in light of the "uniquely broad and remedial purposes thereof." Even considering this more liberal standard, Plaintiff has failed to raise a genuine issue of material fact that he was actually subjected to discriminatory treatment other than his denial of a salary increase in 2005.

he complained to Human Resources about the comment. This made KMBS management aware of the complaint. As described below, the evidence is sufficient to establish that the 2005 denial of a salary increase was an adverse employment action with the required causal connection. However, Plaintiff's evidence is insufficient to establish an adverse employment action and causal connection with respect to the 2006 denial of a raise and the 2006 termination.

### 1. Adverse Employment Action and Causal Connection

 To establish that a retaliatory adverse employment action occurred, the same analysis as employed in the discrimination context applies. As the Supreme Court stressed in *Burlington Northern and Santa Fe Ry. Co. v. White*, the purpose of the anti-retaliation provision is to protect an employee from injury or harm, not from all instances of retaliation. 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Title VII is not intended to institute a "code of civility" in the American workplace, but to prevent retaliation that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S.Ct. 2405. As discussed in the prior section, only two of Plaintiff's allegations rise to the level of an adverse employment action: the denial of a pay increase in 2005 and 2006 and his 2006 termination.

 Once an adverse employment action has been sufficiently alleged, Plaintiff must successfully establish a causal connection between the protected activity and the adverse employment action. A causal connection "can be established by showing that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus." *Uddin v. City of New*

*York*, 427 F.Supp.2d 414, 432 (S.D.N.Y. 2006). Nidzon complained to Human Resources in July 2004. He was first denied a salary increase in January 2005, just less than six months later. He was again denied a salary increase in early 2006, immediately prior to his termination. Plaintiff was terminated in February 2006, seventeen months after his complaint.

The Second Circuit has not drawn a "bright line" to determine when the temporal relationship is too attenuated between the protected activity and retaliatory conduct. *Blanco v. Brogan*, 620 F.Supp.2d 546, 557 (S.D.N.Y.2009). While at least one court has found five months to be a sufficiently close temporal relationship, most courts addressing the issue have found a five month lapse too attenuated to support the finding of a causal connection. *Id.*

### 2. Termination and Denials of a Salary Increase

 Because of the year and a half delay, Plaintiff's argument that there is a causal connection between his complaint to Human Resources and his termination fails. Therefore, Plaintiff has not alleged a *prima facie* case that Nidzon's termination could constitute retaliation. The same reasoning applies to Nidzon's February 2006 denial of a salary increase, which is too distant from the protected activity to find a causal connection.

 As to the denial of a salary increase in 2005, consideration of the surrounding circumstances supports a finding that Nidzon's complaint could be causally related. The January 2005 performance review was the first formal evaluation of Nidzon since his complaint was made and was five months after the protected activity. Courts have found that even where there is a significant gap between a protected activity and adverse action, if the

action is the first opportunity for a retaliatory action, it can be considered causally related. *See Quinby v. WestLB AG*, 2007 WL 1153994 at *13 (S.D.N.Y.2007). Plaintiff has successfully raised an issue of material fact as to whether this action was retaliatory.

### B. *McDonnell Douglas* Burden Shifting Framework

Plaintiff has established a *prima facie* case of unlawful retaliation as to the January 2005 compensation review. The burden then shifts to Defendant to prove that there was a legitimate, non-discriminatory reason for the denial of a raise.

Plaintiff's performance review for that time period gave a non-discriminatory reason for the decision. His productivity had dropped because he was not trained on enough machines, and he had a high incidence of incomplete calls, therefore lowering his overall rating to "Satisfactory" from his prior "Commendable." The review also documented his unprofessional behavior in dealing with KMBS managers. (Technician Evaluation Form for Ruben Nidzon, Def.'s Ex. 7.) Defendant therefore has met its burden, shifting the obligation back to the Plaintiff to show that the reasons advanced were pretextual.

 To defeat a motion for summary judgment, a plaintiff must establish pretext by producing evidence sufficient to allow a reasonable jury to conclude the employer's reasons were not the real reason motivating the adverse employment action. *Blanco*, 620 F.Supp.2d 546 at 554. A plaintiff must prove that the action was motivated by an impermissible factor, though they do not have to disprove the employer's offered nondiscriminatory rationale. *Id.* As the protected activity occurred within approximately five months of the raise denial, and Nidzon alleges an additional discriminatory remark was made by Siriram around the same time as the review, Plaintiff has met his burden. A reasonable jury could find that the denial of a raise was retaliatory. Therefore, summary judgment is denied as to this claim.

### C. Retaliation Claims under the NYCHRL

 With respect to Plaintiff's retaliation claims under the NYCHRL, this Court recognizes that in light of the 2005 Restoration Act and the recent First Department decision *Williams v. New York City Housing Authority*, we must construe the NYCHRL "more broadly than federal civil rights laws and the State HRL." 61 A.D.3d 62, 872 N.Y.S.2d 27, 36–37 (1st Dep't 2009). To establish a retaliation claim under this more liberal standard, the analysis is similar to that of the federal and state law analysis, but the employee need not suffer "a materially adverse change in the terms and conditions of employment" as required by Title VII. Retaliation in "any manner" will suffice. *Id.* at 31. However, a plaintiff must still link the adverse action to a "retaliatory motivation." *Id.* at 34. Moreover, summary judgment is still appropriate where a defendant "can prove that the alleged discriminatory conduct in question ... could only reasonably be interpreted as representing no more than petty slights or trivial inconveniences." *Kaur v. New York City Health and Hospitals Corp.*, 688 F.Supp.2d 317, 340 (S.D.N.Y.2010) (quoting *Williams* 872 N.Y.S.2d at 41).

 This Court has engaged in an "independent analysis" of Plaintiff's claims under this standard and finds that no genuine issue of material fact has been raised indicating that Plaintiff actually suffered from adverse acts with the requisite retaliatory motive other than the 2005 denial of a salary increase. As analyzed in section II(A)(1) (describing Plaintiff's claims of ad-

verse employment actions in the discrimination context), Plaintiff either has failed to produce evidence that the treatment amounted to anything more than "petty slights or trivial inconveniences" or that these alleged adverse actions were at all linked to a retaliatory motivation. Therefore, even under the more liberal standard of the NYCHRL, Plaintiff's additional claims of adverse employment actions cannot constitute retaliation "in any manner" and therefore are dismissed.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is DENIED with respect to Plaintiff's claims of discrimination and retaliation when denied a salary increase in January 2005 under Title VII, the NYSHRL and the NYCHRL. Defendant's Motion is GRANTED in all other respects. The Court directs the parties to submit a proposed joint pretrial order and any motions in limine on or before November 22, 2010. **SO ORDERED.**